# EXHIBIT 3

# To Defendant's Statement of Material Facts Not in Dispute

# Excerpts of the Deposition of Richard Sanders

Page 1

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF WASHINGTON

    _____

3

    RICHARD SANDERS,                )

4                                   )

              Plaintiff(s),         )

5                                   )

        vs.                         )   1:20-cv-03137-SAB

6                                   )

    WESTERN EXPRESS, INC.,          )

7                                   )

              Defendant(s).         )

8   _____

9    Video Recorded Virtual Zoom Deposition Upon Oral

                  Examination of

10

                 RICHARD SANDERS

11  _____

12

13                9:29 a.m.

14              June 15, 2021

15             1620 Canyon Road

16          Ellensburg, Washington

17

18

19

20

21

22

23   REPORTED BY:  Mindi L. Pettit, RPR, WA CCR #2519,

24  ID CSR #1141

25

Exhibit 3

Page  1 of 61

```
                                                  Page 2
 1                  A P P E A R A N C E S

 2

 3     For the Plaintiff:
       (Present via Virtual Zoom)

 4

           JOSHUA H. HAFFNER, ESQ.
 5         Haffner Law PC
           445 South Figueroa Street, Suite 2625
 6         Los Angeles, California 90071
           (213) 514-5681
 7         jhh@haffnerlawyers.com

 8

       For the Defendant:
 9     (Present via Virtual Zoom)
10         ADAM C. SMEDSTAD, ESQ.
           Scopelitis, Garvin, Light, Hanson & Feary, P.C.
11         3214 West McGraw Street, Suite 301F
           Seattle, Washington 98199
12         (206) 288-6192
           asmedstad@scopelitis.com
13         and
           JAMES A. ECKHART, ESQ.
14         Scopelitis, Garvin, Light, Hanson & Feary, P.C.
           10 West Market Street, Suite 1400
15         Indianapolis, Indiana 46204
           (317) 637-1777
16         jeckhart@scopelitis.com

17

18     Also Present:  Alan Morgan, Veritext
                       (Present via Virtual Zoom)
19                     Rob Welhoelter

20

21

22

23

24

25
```

Exhibit 3
Page  2 of 61

Page 3

```
 1                   I N D E X

 2

 3   EXAMINATION BY:                        PAGE(S)

 4   MR. SMEDSTAD                              6

 5

 6

 7

 8

 9

10   EXHIBITS FOR IDENTIFICATION            PAGE

11    Exhibit 1    Western Express, Inc. Employment    32

12                 Offer Letter to Mr. Sanders,

13                 12-11-19

14    Exhibit 2    First Amended Class Action    35

15                 Complaint (Jury Trial Demanded)

16    Exhibit 3    Western Express, Inc. Authorized    77

17                 Payroll Deductions for

18                 Mr. Sanders, 12-11-19

19

20

21

22

23

24

25
```

```
                                            Page 4

 1              Ellensburg, Washington; June 15, 2021

 2                         9:29 a.m.

 3                         --oOo--

 4              (This deposition is being taken via

 5               videoconference and all parties, the

 6               witness, the videographer, and court

 7               reporter are appearing remotely.)

 8              THE VIDEOGRAPHER:  We are going on the

 9   record at 9:29 a.m. on June 15th, 2021.  Please note

10   that microphones are sensitive and may pick up

11   whispering, private conversations, and cellular

12   interference.  Please turn off all cell phones or place

13   them away from the microphones as they can interfere

14   with the deposition audio.  Audio and video recording

15   will continue to take place unless all parties agree to

16   go off the record.

17              This is Media Unit 1 of the video recorded

18   deposition of Richard Sanders taken by counsel for the

19   defendant in the matter of Richard Sanders versus

20   Western Express, Inc., filed in the United States

21   District Court, Eastern District of Washington, Case

22   No. 1:20-cv-03137-SAB.  This deposition is being held

23   at 1620 Canyon Road, Ellensburg, Washington 98926.

24              My name is Alan Morgan from the firm Veritext,

25   and I'm the videographer.  The court reporter is Mindi
```

Exhibit 3
Page 4 of 61

Page 5

1    Pettit from the firm Veritext.  I am not authorized to

2    administer an oath, I'm not related to any party in

3    this action, nor am I financially interested in the

4    outcome.

5            If there are any objections to proceeding,

6    please state them at the time of your appearance

7    beginning with the noticing attorney.

8            Will all present please state their name and

9    affiliations for the record.

10               MR. SMEDSTAD:  Good morning.  Adam

11   Smedstad on behalf of the defendant.

12               MR. ECKHART:  Good morning.  James

13   Eckhart on behalf of the defendant.

14               MR. HAFFNER:  Good morning.  Joshua

15   Haffner on behalf of plaintiff.  And just for the

16   record, I'd like to note we have Rob Welhoelter from

17   defendant Western Express present virtually.

18               MR. WELHOELTER:  Yeah, I'm -- I'm here.

19   I'm an attorney and VP of risk management.

20                    RICHARD SANDERS,

21     sworn as a witness pursuant to the Supreme Court of

22     Washington's Order No. 25700-B-610 by the Certified

23           Court Reporter testified as follows:

24

25

Exhibit 3
Page  5 of 61

Page 10

1    license?

2        A.  Yes, I did.

3        Q.  And when did you get your commercial driver's

4    license?

5        A.  It was 2019.

6        Q.  Did you go to school to get a CDL?

7        A.  I went to Swift Transportation School.

8        Q.  How long did you attend Shift -- Swift

9    Transportation School in order to get your commercial

10   driver's license?

11       A.  Three weeks.

12       Q.  And what class of commercial driver's license

13   did you obtain?

14       A.  Class A.

15       Q.  When you were at Swift Transportation School,

16   did you learn about the Federal Motor Carrier Safety

17   Administration hours of service regulations?

18       A.  I'm sorry, you -- you cut out.  I didn't hear

19   the whole thing.

20       Q.  When you went to Swift Transportation School,

21   did you learn about the Federal Motor Carrier Safety

22   Administration's hours of service regulations?

23       A.  Yes.

24       Q.  And what is your understanding of those

25   regulations?

Page 11

1       A.  Drive -- drive on duty 14 hours, drive 11

2   hours, break for ten hours.

3       Q.  And when you say "break," do you mean, off

4   duty?

5              THE WITNESS:  He keeps cutting out.

6       Q.  (By Mr. Smedstad)  I think that's a -- an

7   internet problem in that -- in that location.  So your

8   understanding is that a driver can be on duty for a

9   maximum of 14 hours?

10      A.  Yes, then you're out.

11      Q.  And of that 14 hours, you -- a driver can only

12  legally drive for 11 hours?

13      A.  Yes.

14      Q.  And then they have to take a ten-hour off-duty

15  break, correct?

16      A.  Correct.

17      Q.  And during that break, you're supposed to get

18  sleep and become rested so that you can safely drive

19  the following day, correct?

20      A.  Yes.

21      Q.  Under the hours of service regulations, if

22  you're performing nondriving work, how would you record

23  your duty status?

24      A.  Sorry, I didn't hear the whole thing.  It cut

25  out again.

Page 12

1      Q.  Sure.  Under the hours of service regulations,

2  if you're performing nondriving work, how should you

3  record your duty status?

4      A.  On duty, not driving.

5      Q.  Regardless of what kind of work you're doing,

6  correct?

7      A.  Correct.

8      Q.  After finishing Swift Transportation School,

9  where did you first get a job as a professional truck

10  driver?

11      A.  With Swift.

12      Q.  And what kind of a truck were you driving?

13      A.  Which style?  A make?  Model?

14      Q.  Well, what was -- do you know what a gross

15  vehicle weight rating is?

16      A.  Yes.

17      Q.  And what is that?

18      A.  80,000 pounds.

19      Q.  And were you driving a truck for Swift that

20  had a gross vehicle weight rating of 80,000 pounds?

21      A.  Yes.

22      Q.  And where were you hired by Swift?

23      A.  In Lewiston, Idaho.

24      Q.  And what were you doing for Swift?

25      A.  I first started out driving dedicated for

Exhibit 3
Page  8 of 61

Page 15

1    conclusion and calls for a legal conclusion, and I

2    object to the form.

3        Q.  (By Mr. Smedstad)  Go ahead.  You -- you can

4    answer, Mr. Sanders.

5        A.  I'm not -- as long as I'm still in that truck,

6    I'm solely responsible for every -- the truck and the

7    contents of my trailer.

8        Q.  Did you ever leave your truck while you were

9    driving with Swift?

10       A.  To go to the bathroom, yes.  And eat -- go get

11   something to eat, yes, in the truck stop.

12       Q.  And you could do that by simply parking the

13   truck in a safe, secure location, correct?

14       A.  Correct.

15       Q.  Perhaps backing it up against a wall?

16       A.  Or just backing it up in a space, yes.

17       Q.  And then you could safely leave that truck,

18   correct?

19       A.  Yes.

20       Q.  How long did you drive for Swift?

21       A.  Six months, eight months.

22       Q.  How were you paid?

23       A.  By the mile.

24       Q.  Were you paid by hub miles or by allocated

25   miles?

Exhibit 3
Page  9 of 61

Page 19

```
 1        A.  About a month and a half.
 2        Q.  And after dealing with your family emergency,
 3   did you go looking for employment as a -- a truck
 4   driver?
 5        A.  Yes, I did with Western Express.
 6        Q.  Did you say with Western Express?
 7        A.  Yes, sir.
 8        Q.  How did you hear about the opportunity to
 9   drive for Western Express?
10        A.  The internet.
11        Q.  Did you go looking for Western Express?
12        A.  No, I just -- I was just looking for job
13   openings.
14        Q.  Did you see any advertisements about job
15   openings from Western Express?
16        A.  Yes, on the internet.
17        Q.  What did those advertisements say?
18        A.  They just -- I -- job opening at Western
19   Express.
20        Q.  Did they say anything about how drivers were
21   paid?
22        A.  No.  I --
23        Q.  Anything else?
24        A.  I -- no.
25        Q.  Did they say anything about the nature of the
```

Exhibit 3
Page  10 of 61

Page 20

1  freight that you would be driving?

2      A.  Not until I called 'em.

3      Q.  I just want to deal with the -- the

4  advertisements that you looked at first.  All right?

5  Then we'll talk about what the --

6      A.  All right.

7      Q.  Did they say anything about whether or not you

8  would be paid overtime if you worked more than 40 hours

9  in a week?

10      A.  No.

11      Q.  Did the advertisements that you looked at say

12  anything other than come apply for a job as a

13  commercial truck driver for Western Express?

14      A.  No.

15      Q.  Other than the advertisements that you saw on

16  the internet, did you read any literature or printed

17  materials about the opportunity to drive at Western

18  Express?

19      A.  No.

20      Q.  Was Western Express the only motor carrier

21  that you called when you were searching for job

22  openings as a truck driver?

23      A.  I didn't call anybody at that time.  I was

24  still looking for jobs on the internet.

25      Q.  How long did you look for a job on the

Page 21

1    internet?

2        A.  About a month.

3        Q.  And did you find a job?

4        A.  Yes.

5        Q.  And did you consider interviewing with motor

6    carriers other than Western Express?

7        A.  No.

8        Q.  Why?

9        A.  'Cause Western Express contacted me.

10       Q.  How did they get your information, do you

11   know?

12               MR. HAFFNER:  Objection, calls for

13   speculation.

14               MR. SMEDSTAD:  That's why I said did you

15   know -- "do you know."

16       A.  No.

17       Q.  (By Mr. Smedstad)  Did you fill out an online

18   interest?

19       A.  Yes.

20       Q.  Did you provide your contact information?

21       A.  Yes.

22       Q.  So you provided Western Express with your

23   contact information, correct?

24       A.  Yes.

25       Q.  And they contacted you?

Exhibit 3
Page  12 of 61

Page 22

1    A.  Yes.

2    Q.  Did you fill out any similar forms for other

3    motor carriers?

4    A.  Yes.

5    Q.  Did they contact you?

6    A.  No.

7    Q.  Was there something about the opportunity at

8    Western Express that you found more attractive than

9    other motor carriers?

10   A.  No.

11   Q.  Who contacted you from Western Express?

12   A.  The recruiter.

13   Q.  Do you know that person's name?

14   A.  No, I do not.

15   Q.  How long did you speak to the recruiter?

16   A.  Couple times, a couple minutes at a time.

17   Q.  What did you talk about?

18   A.  Where I would be sent, what -- what the job

19   was and . . .  My background.  That's . . .

20   Q.  Did the recruiter tell you anything about how

21   you would be paid?

22   A.  No.

23   Q.  Did the recruiter tell you that you would be

24   paid overtime?

25   A.  He didn't mention it.

Page 23

1    Q.  Did the recruiter make any representations to

2  you about the nature of the job opportunity at Western

3  Express?

4    A.  I'm not sure I understand fully what you're

5  asking.

6    Q.  Well, you told me that the recruiter -- you

7  and the recruiter talked for a couple of minutes a

8  couple different times, correct?

9    A.  Correct.

10    Q.  And you told me that you talked about your

11  background, right?

12    A.  Right.

13    Q.  And where you would be going, right?

14    A.  Yes.

15    Q.  And -- and where did the recruiter tell you

16  you would be hauling freight?

17    A.  The western part of the United States.

18    Q.  The western ten states?

19    A.  California, Oregon, Washington, Arizona.

20    Q.  And other than telling you where you would be

21  hauling freight and discussing your background, did you

22  have any other substantive discussions with the

23  recruiter from Western Express?

24    A.  I don't know what that means.

25    Q.  Did you talk to the recruiter about anything

Exhibit 3

Page  14 of 61

Page 24

1    else?

2         A.   Where I'd be going, how I would get there.

3         Q.   Anything else?

4         A.   No.

5         Q.   As you reflect back on what the recruiter told

6    you, was there anything that the recruiter told you

7    that turned out not to be true?

8         A.   Yes.

9         Q.   What?

10        A.   Home time, pay.

11        Q.   Anything else?

12        A.   No.

13        Q.   So let's unpack that one at a time.  I asked

14   you what you discussed and whether you discussed

15   anything other than where you would be hauling and your

16   background, and you said no.  Now you're saying that

17   the -- the recruiter made some representation to you

18   about home time.  What was it that the recruiter said

19   to you about home time?

20        A.   No, you asked me what I did not like about

21   Western Express.

22        Q.   No -- well, then -- then we had a

23   misunderstanding.  I'm asking you if the recruiter told

24   you anything that turned out not to be true.

25        A.   No, it -- no.

Exhibit 3
Page  15 of 61

Page 25

1      Q.   So this -- as best as you can recollect, the

2    recruiter didn't tell you anything about Western

3    Express that turned out not to be true.  Is that

4    correct?

5      A.   Correct.

6      Q.   After talking with this recruiter, did you

7    fill out an application for a job with Western Express?

8      A.   Yes.

9      Q.   And where did you do that?

10      A.   At home.

11      Q.   Online?

12      A.   Yes.

13      Q.   Okay.  What was the gross vehicle weight

14    rating of the trucks that you operated for Western

15    Express?

16      A.   80,000 pounds.

17      Q.   Did you need a Class A commercial driver's

18    license to operate those trucks?

19      A.   Yes.

20      Q.   After filling out the job application, what

21    did you do next to explore the opportunity with Western

22    Express?

23      A.   Sit around waiting for their call.

24      Q.   All right.  Would you just walk me through the

25    application process.  You filled out the application.

Page 26

1    You waited for the call.  Then what happened?

2        A.  Then they contacted me.

3        Q.  Okay.  And who contacted you?

4        A.  I'm not sure.

5        Q.  Was it another recruiter?

6        A.  It was somebody saying that they would send me

7    a ticket.

8        Q.  And what did the somebody say to you?

9        A.  That I was -- I would be hired.  They were

10   going to send me a ticket to go down to California for

11   orientation.

12       Q.  Prior to this conversation where the person

13   indicated they would be sending you a ticket to go down

14   to California for orientation, did you have a formal

15   interview with anyone from Western Express?

16       A.  What do you mean "formal interview"?

17       Q.  Where someone asked you questions related to

18   your ability to perform the job that they were

19   considering hiring you for?

20       A.  Yes.

21       Q.  And with whom did you have the interview?

22       A.  I can't remember.

23       Q.  And where did the interview take place?

24       A.  Over the phone.

25       Q.  How long did the interview last?

Exhibit 3
Page  17 of 61

Page 27

1      A.   I'm not sure.

2      Q.   Did the person from Western Express make any

3   representations to you about the opportunities at

4   Western Express that turned out not to be true?

5      A.   At that time, no.

6      Q.   When the person called you and told you that

7   they would be sending you a ticket to come down to

8   California for orientation, did you ask that person any

9   questions about the job?

10     A.   I don't remember if I did.   I might have.   I'm

11   not sure what.

12     Q.   Did the person who told you they were going to

13   send you the ticket to come to California tell you

14   anything about the pay you would be receiving at

15   Western Express?

16     A.   I can't remember.

17     Q.   Was it important to you how you would be paid?

18     A.   Yeah.

19     Q.   Why?

20          MR. HAFFNER:   Well, I'm going to object,

21   argumentative, form.

22        Go ahead.

23     Q.   (By Mr. Smedstad)   You can answer.

24     A.   Pay -- I mean . . .   That's an obvious thing,

25   is how you're going to be paid.

Page 28

1      Q.   Did you ask how much you would be paid at

2  Western Express?

3      A.   I don't remember if I asked or they told me.

4  I'm not sure.

5      Q.   Do you recall what they said?

6      A.   Like I said, I'm not sure.

7      Q.   As part of the application process, did you

8  have to demonstrate that you satisfied the department

9  of transportation qualifications to drive a commercial

10 motor vehicle?

11     A.   What do you mean by "demonstrate"?

12     Q.   Provide information about your commercial

13 driver's license, the class of the driver's license,

14 your motor vehicle record or --

15     A.   Yes, I had to send them a picture of my Class

16 A driver's license.

17     Q.   And did you authorize Western Express to pull

18 a motor vehicle record on your driving?

19     A.   Yes.

20     Q.   And did you have to fill out a form reflecting

21 what your hours of service had been for the preceding

22 seven days?

23     A.   I don't remember.

24     Q.   After being told that Western Express was

25 going to send you a ticket to come to California, did

Exhibit 3
Page  19 of 61

Page 29

1    you agree to go to California?

2         A.   Yes, I did.

3         Q.   And when -- how long after this call in which

4    the person from Western Express advised you that you

5    would be coming to California for orientation did you,

6    in fact, go to California?

7         A.   I'm not sure exactly.

8         Q.   Best estimate.

9         A.   Oh, they called me up and said they -- they --

10   probably about a day or two.

11        Q.   Do you remember what month and year this was?

12        A.   December of -- hmm -- 2019.

13        Q.   And where in California did you go?

14        A.   Bloom -- Bloomington.

15        Q.   And how long were you in Bloomington,

16   California?

17        A.   The -- until I got done with my orientation

18   and I went out with a trainer.

19        Q.   How long was orientation?

20        A.   It was three days.

21        Q.   Do you recall what information was discussed

22   at orientation?

23        A.   No, I can't recall.

24        Q.   Do you recall whether it was related to

25   safety -- the safe operation of a commercial motor

Exhibit 3
Page  20 of 61

Page 34

```
 1    did Western Express tell you that it was located in
 2    Nashville, Tennessee?
 3        A.  Yes.
 4        Q.  And did they tell you that all of the work
 5    assignments would originate from Tennessee?
 6        A.  I don't remember that.
 7        Q.  Do you recall Western Express telling you that
 8    your employment with Western Express would be
 9    determined in the state of Tennessee?
10        A.  No, I don't.
11        Q.  You filed a complaint in this case, correct?
12        A.  Correct.
13        Q.  Did you review it prior to it being filed?
14        A.  I -- I don't know.
15        Q.  Are you aware that you filed an amended
16    complaint in this case?
17                MR. HAFFNER:  I'm going to object to the
18    form of the question, form.  He's represented by
19    counsel in this matter.
20        Q.  (By Mr. Smedstad)  Are you aware that a second
21    complaint has been filed on your behalf that altered
22    the allegations contained in the first complaint?
23        A.  I don't know that -- I leave everything up to
24    my lawyer.
25        Q.  As you sit here today, have you ever read any
```

Exhibit 3
Page 21 of 61

Page 35

1    of the allegations contained in either of the

2    complaints that were filed on your behalf?

3        A.  I have not read anything about -- like I said,

4    I leave that up to my lawyer.

5        Q.  Just to cover the point, I'm going to

6    introduce a copy of your first amended complaint.

7                    (Deposition Exhibit 2 was marked for

8                     identification.)

9        Q.  (By Mr. Smedstad)  I'm going to share my

10   screen again.  Can you see my screen, sir?

11       A.  Yes.

12       Q.  All right.  And, sir, I'm going to show you

13   what I've marked for identification as Exhibit 2, and

14   I'll represent for the record it's a 16-page document

15   that is a copy of the First Amended Class Action

16   Complaint filed on behalf of Richard Sanders versus

17   Western Express.  And I'm just going to slowly scroll

18   through it and ask you if you've ever seen this

19   document before.  You tell me if I'm going too fast.

20               MR. HAFFNER:  Mr. Sanders, can you

21   answer the question.

22               MR. SMEDSTAD:  Well, I'm -- I'm letting

23   him see the whole thing, Josh.

24               MR. HAFFNER:  Well, if he can answer, he

25   can go ahead and answer.

Exhibit 3
Page  22 of 61

Page 36

```
 1          A.  No, I -- I don't remember seeing all of this.
 2          Q.  (By Mr. Smedstad)  So, as you sit here today,
 3     you can't ever recall seeing a copy of Exhibit 2?
 4          A.  No.
 5          Q.  Is that correct?
 6          A.  That's correct.
 7          Q.  Do you know whether the information contained
 8     in Exhibit 2 is accurate?
 9               MR. HAFFNER:  Objection, overbroad,
10     calls for speculation, vague, form.
11          Q.  (By Mr. Smedstad)  Go ahead and answer, sir.
12               MR. HAFFNER:  Calls for a contention
13     interrogatory as well.
14          Q.  (By Mr. Smedstad)  Go ahead and answer, sir.
15          A.  If I remember what it entails?
16          Q.  No.  I'm asking you whether or not you --
17     whether you know whether the information contained in
18     Exhibit 2 is accurate.
19               MR. HAFFNER:  I'm going to object as
20     to -- he just testified he had -- he didn't -- he
21     didn't know it -- he didn't know about it.  So I don't
22     know what you're asking about, like --
23               Go ahead, you can answer to the best you can.
24          A.  No, I don't know what's in it if I can't
25     remember if I've seen.
```

Exhibit 3
Page 23 of 61

Page 40

1       Q.   During the time that you drove for Western

2   Express, did they, in fact, compensate you at 38 cents

3   a mile?

4       A.   Yes.

5       Q.   Did they give you pay statements?

6       A.   On my Qualcomm.

7       Q.   Did you look at those?

8       A.   Yes.

9       Q.   And did you check them to make sure they were

10  correct?

11      A.   Yes.

12      Q.   And other than the instance of the missing

13  breakdown pay, were there any other instances in which

14  Western Express failed to compensate you correctly?

15      A.   Yes.

16      Q.   Tell me about that.

17      A.   Because I'm . . .  I can't remember all of it.

18      Q.   Can you think of a single instance, other than

19  the breakdown pay that you did not receive?

20      A.   As in?

21      Q.   Where you looked at your driver pay statement,

22  determined that you were not paid correctly.

23      A.   Yeah, because I -- I knew I drove more -- more

24  miles than what was said.

25      Q.   And how many times did that happen?

Exhibit 3
Page  24 of 61

Page 42

1    would get paid on, correct?

2        A.  Yes.

3        Q.  And did the miles that the Qualcomm showed you

4    tie out with the miles that Western Express actually

5    paid you on?

6        A.  I don't know.

7        Q.  You told me that you had a driver manager

8    named Marcus.  Correct?

9        A.  Yes.

10       Q.  And is that your only driver manager while you

11   were working for Western Express?

12       A.  No, I had two others.

13       Q.  And what were the names of your other driver

14   managers?

15       A.  I can't remember right now.

16       Q.  Do you recall if they were men or women?

17       A.  They were men.

18       Q.  Do you recall where they were located?

19       A.  In Bloomington.

20       Q.  Again, California?

21       A.  Yes.

22       Q.  Walk me through the dispatch process.

23       A.  I would receive based upon the Qualcomm.

24       Q.  You would receive a what on the Qualcomm?

25       A.  My -- where to go, where my pickup was, and

Page 43

```
 1    where to deliver it to.
 2         Q.  Do you know who sent the Qualcomm message?
 3         A.  No, I don't know who sent it.  It comes over
 4    the Qualcomm.
 5         Q.  Do you know whether you had a dispatcher?
 6         A.  I probably did.
 7         Q.  Do you know who your dispatcher was?
 8         A.  No.
 9         Q.  Do you know where the dispatch assignments
10    came from?
11         A.  My understanding, it was from Bloomington.
12         Q.  Where did you get that understanding?
13         A.  When I would go back to the terminal, talk to
14    my driver manager, they had the dispatchers right next
15    to 'em.
16         Q.  And your -- your terminal was located in
17    Bloomington, California?
18         A.  Yes.
19         Q.  And was that true for the entire time that you
20    worked for Western Express?
21         A.  Yes.
22         Q.  Did you report to work each day in
23    Bloomington, California?
24         A.  I'm not sure what you mean by that.
25         Q.  Well, you told me a bit ago that your dispatch
```

Exhibit 3
Page  26 of 61

Page 45

1      Q.   So you worked for Western Express for

2   approximately seven months; is that right?

3      A.   Yeah, about that.

4      Q.   And during that seven-month period, you showed

5   up physically to the terminal located in Bloomington,

6   California, a couple times?

7      A.   Yeah, a few times.  I mean, you know, I

8   couldn't remember the exact amount of times, but . . .

9      Q.   Fewer than ten?

10      A.   Yes.

11      Q.   As you sit here today, are you aware of any

12   facilities that Western Express has in Washington

13   State?

14      A.   What do you mean?  Terminals?

15      Q.   Yes.

16      A.   No, I'm not aware of any.

17      Q.   Have you ever been to a building that Western

18   Express owned in Washington State other than a

19   terminal?

20      A.   No.

21      Q.   Are you aware of Western Express having any

22   dispatchers in Washington State?

23      A.   No.

24      Q.   I think the answer to this question is no, but

25   I want to make sure I understand what you said.  While

Exhibit 3
Page  27 of 61

Page 46

1    you were working for Western Express, did you have a

2    regular route?

3        A.   No.

4        Q.   So it was just all over, correct?

5        A.   Correct.

6        Q.   And how long would you be on the road before

7    coming home?

8        A.   It depends.  Could be a month to two months.

9    But I tried to get home every month.

10       Q.   I apologize, I tried to get all my?  You

11   said I tried to get all my --

12                 MR. HAFFNER:  No, I think he said I

13   tried to be home every month.

14                 THE WITNESS:  Yes, I did.

15       Q.   (By Mr. Smedstad)  Did you tell anyone at

16   Western Express that you wanted to get home every

17   month?

18       A.   Well, I put in a home request every month

19   through my Qualcomm.

20       Q.   And did Western Express authorize you to go

21   home every month?

22       A.   Pretty much all the time, except for once.

23       Q.   And what was the one time that Western Express

24   did not allow you to go home?

25       A.   The last time.  They -- they allowed me to go

Page 47

1    home, but it -- they were messing around.

2        Q.  What does that mean?

3        A.  It means they were trying not to get me home.

4        Q.  Tell me what you mean by that.

5        A.  They kept telling me they had no runs up to

6    Washington.

7        Q.  Did you believe that that was not true?

8        A.  I knew that was not true.

9        Q.  How did you know it wasn't true?

10       A.  Because I know they go up to Washington all

11   the time.

12       Q.  How do you know that they had runs at the time

13   you were requesting to go back to Washington?

14       A.  'Cause I know they go up there.

15       Q.  Anything else?  Any other ways -- basis?

16       A.  Just common knowledge.

17       Q.  And when they told you that you didn't have --

18   that they didn't have runs back to Washington, did you

19   go ahead and take the truck to Washington anyway?

20       A.  No.  They finally got a run up to Washington

21   eventually.

22       Q.  Okay.  Do you believe that someone at Western

23   Express was intentionally trying to thwart your ability

24   to get home?

25       A.  Yes, I believe that.

Page 56

1          Q.  A few hundred or 200?

2          A.  200.

3          Q.  And I apologize, sir, I'm just trying to make

4     sure I can hear you correctly.

5          A.  It's all right.

6          Q.  Are you familiar with IFTA?

7          A.  Yeah, don't know what -- what's IFTA?

8          Q.  I-F-T-A?

9          A.  No, I don't.

10         Q.  Are you aware that Western Express tracks the

11    miles that your truck drives and which state it drives

12    in?

13         A.  I would imagine they have the GPS on the --

14    all trucks so they know where I'm at.

15         Q.  When you were working for Western Express,

16    were you using paper logs or electronic logs?

17         A.  Electronic.

18         Q.  And who decided what your duty status would be

19    while you were working for Western Express?

20         A.  I'm sorry, what do you mean by that?

21         Q.  Well, if the truck was moving, did the ELD

22    automatically go to driving?

23         A.  Yes, it would.

24         Q.  And when the truck was stopped, did you have

25    to make a decision as to whether to record your duty

Exhibit 3
Page  30 of 61

Page 57

1    status as off duty or on duty not driving?

2        A.  Yes.

3        Q.  And you were the individual that made that

4    decision, correct?

5        A.  Yes.

6        Q.  Is it yes?

7        A.  Yes.

8        Q.  And that's based on whether you were working

9    or going off duty, correct?

10       A.  Yes.

11       Q.  So, if you're not working and not in the

12   sleeper berth, you would log that as off duty, correct?

13       A.  Yes.

14       Q.  And if you were not working and spending your

15   time in the sleeper berth, you would mark that as

16   sleeper berth, correct?

17       A.  Yeah, correct.

18       Q.  Did you make an effort to record your duty

19   statuses accurately?

20       A.  Yes.

21       Q.  What are you doing now, by the way?

22       A.  Talking to you.

23       Q.  That's -- that's an excellent answer.  What

24   are you doing now for a living, sir?

25       A.  Right now I'm working at the fairgrounds in

Page 59

1      Q.  And are you no longer able to legally drive a

2  commercial motor vehicle?

3      A.  No, I can still drive one.

4      Q.  It's just difficult?

5      A.  Yes, and I don't . . .  I don't want to have

6  something happen.

7      Q.  You don't feel like you would be safe doing

8  it?

9      A.  I feel like I'd be safe, but I don't know

10 what -- how -- I'm worried about if something does

11 happen, I don't want to be felt -- I don't want to hurt

12 anybody.

13     Q.  Do you know any other drivers who drove for

14 Western Express?

15     A.  I've met some, yes.

16     Q.  Do you know any by name?

17     A.  I can't -- I can't remember their names right

18 now.

19     Q.  Do you know whether or not other drivers from

20 Western Express accurately recorded their duty status?

21     A.  I wouldn't have no knowledge of what they do.

22     Q.  You told me earlier this morning that when

23 you're performing nondriving work for Western Express,

24 you should record your duty status as on duty not

25 driving, correct?

Page 60

```
 1        A.  Well, if -- if . . .  Well, off -- log --
 2   no -- what do you mean?
 3        Q.  So, for example, if you're doing a pretrip
 4   inspection, you would record that as on duty not
 5   driving, correct?
 6        A.  That would be on duty.
 7        Q.  Yeah.  Not driving -- you're not driving while
 8   on --
 9        A.  Correct.
10        Q.  -- duty?  And you got to wait until I finish.
11   I apologize.
12        A.  I'm sorry.
13        Q.  Yeah.  And if you do a post trip, you're going
14   to record that as on duty not driving, correct?
15        A.  Correct.
16        Q.  And if you fuel, you're going to record that
17   as on duty not driving, correct?
18        A.  Correct.
19        Q.  And you're supposed to log yourself as on duty
20   if you're doing any work, correct?
21        A.  Correct.
22        Q.  And you understand that sleeper berth time is
23   considered off duty time, correct?
24        A.  Correct.
25        Q.  And how long were you working for Western
```

that you were working for Western Express?

A. No.

Q. How many trucks did you operate?

A. Two.

Q. Did each of those trucks have a sleeper berth?

A. Yes.

Q. If you had been on the road in a truck without a sleeper berth, where would you have had to take your break time?

MR. HAFFNER: Objection, calls for hypothetical, calls for speculation.

Q. (By Mr. Smedstad) Go ahead and answer.

A. I don't know where I would sleep or take my off time.

Q. Hotel room?

MR. HAFFNER: Objection, calls for speculation. Form.

Q. (By Mr. Smedstad) Go ahead and answer, sir.

A. I would imagine. I'm not going to sleep on the road. I -- you know.

Q. During the time that you worked at Western Express, did you ever stay in a hotel room instead of sleeping in the sleeper berth?

A. Yes.

Q. Was that your decision?

Page 69

```
 1       A.  Yes.
 2       Q.  And how many times did you decide to stay in a
 3  hotel room instead of the sleeper berth?
 4       A.  Once.
 5       Q.  And why did you do that?
 6       A.  Because they were working on my truck.
 7       Q.  Do you know whether or not other drivers elect
 8  to stay in hotels instead of sleeping in their sleeper
 9  berths when they're on the road?
10       A.  I have no clue.
11       Q.  Are you aware of any Western Express policy
12  that prohibited drivers from staying in hotel rooms
13  when they were off duty?
14       A.  No.
15       Q.  Is it your understanding that you could have
16  elected to stay in a hotel room instead of sleeping in
17  the sleeper berth of your truck if you wanted to?
18       A.  I -- I don't know.
19       Q.  How long did you typically spend in the
20  sleeper berth of your truck while you were working at
21  Western Express?
22       A.  How long?  I mean, the whole time I was
23  working there?
24       Q.  Yeah.
25       A.  I don't know the exact hours.
```

Page 70

1    Q.   I guess what I'm trying to get at is you told
2    me earlier that after being on duty for 14 hours, you
3    had to take a ten-hour break, correct?
4    A.   Correct.
5    Q.   And that time had to be either logged as off
6    duty or sleeper berth, correct?
7    A.   Correct.
8    Q.   And some drivers will only spend ten hours off
9    duty while other drivers will spend longer.  Did you
10   have a practice?
11   A.   I'm not sure I understand what you mean.  Do
12   you mean -- do you mean, how long I stayed in the
13   sleeper berth?
14   Q.   Correct.
15   A.   Ten hours.
16   Q.   And as soon as the ten hours was up, you got
17   out of the sleeper berth and started working again?
18   A.   Yes.
19   Q.   Do you know how long other Western Express
20   drivers elected to stay in the sleeper berth?
21   A.   I would not -- I don't know that information.
22   I don't know what other drivers do.
23   Q.   Did you always work 14 hours every day while
24   you were working for Western Express?
25   A.   Yes.

Page 71

1     Q.  So, if we were to look at your hours of

2  service logs, we would see that you were on duty 14

3  hours a day every day that you worked for Western

4  Express?

5     A.  I would imagine.  There -- there might have

6  been a couple times where I had a quick trip or

7  something.  I -- yeah, I don't know the exact thing

8  right now.

9     Q.  I know you told me that you didn't have a

10  regular route while you were working at Western

11  Express.  Correct?

12     A.  Correct.

13     Q.  Were you primarily working in any one state?

14     A.  No.

15     Q.  Do you recall ever working in Washington State

16  for an entire week?

17     A.  Yes.

18     Q.  How many times?

19     A.  Once.

20     Q.  And when was that?

21     A.  I can't remember the exact dates.

22     Q.  Do you know how long you -- how many hours you

23  worked that week?

24     A.  I can't recall.

25     Q.  Have you ever violated your hours of service

Page 72

1    while you were working at Western Express?

2        A.  No.

3        Q.  As we sit here today, while you were working

4    at Western Express, do you recall a single instance you

5    worked in which you worked more than 40 hours in one

6    week in Washington State?

7        A.  No, I can't recall.

8        Q.  When you decided that it was time to go off

9    duty or go into the sleeper berth, did you go and get

10   something to eat first?

11               MR. HAFFNER:  Objection --

12       A.  Sometimes.

13               MR. HAFFNER:  -- form.

14               MR. SMEDSTAD:  I could hear neither the

15   objection nor the answer.

16               MR. HAFFNER:  Objection, form.

17       Q.  (By Mr. Smedstad)  Go ahead, sir.

18       A.  Sometimes.

19       Q.  Did you have a habit or a routine?

20       A.  No.

21       Q.  Did you have a refrigerator in the sleeper

22   berth?

23       A.  No.

24       Q.  Other than a place to sleep and a microwave,

25   what else was in the sleeper berth of your truck while

Exhibit 3
Page  38 of 61

Page 73

1    you were working at Western Express?

2        A.   At Western Express, I did not have a microwave

3    in my truck.   I had a microwave at Swift.

4        Q.   And why did you elect not to bring your

5    microwave with you to Western Express?

6        A.   Because they did not have a place where I

7    could plug it in -- an inverter.   They did not allow

8    inverters in the truck.

9        Q.   Did you have an ice chest in the truck?

10       A.   Yes.

11       Q.   Anything else?

12       A.   Nope.

13       Q.   Did you think it was important to rest while

14   you were in the sleeper berth of your truck while

15   working at Western Express?

16       A.   Yes.

17       Q.   Did you have a target for the amount of sleep

18   you would like to get each night?

19       A.   I didn't have a target.   It would be however

20   long I did sleep.

21       Q.   Was it your goal to sleep as much of the ten

22   hours as possible?

23       A.   Yes.

24       Q.   Based on your understanding of the hours of

25   service regulations, what is the difference between

Page 74

1    time logged as off duty and time logged as sleeper

2    berth?

3                    MR. HAFFNER:  Objection, calls for a

4    legal conclusion.

5        Q.  (By Mr. Smedstad)  Go ahead and answer, sir.

6        A.  Off duty is you park your truck wherever you

7    go to do -- go to get something to drink or at a rest

8    area, to go to the bathroom.  And a sleeper berth,

9    you're in your sleeper berth.

10       Q.  Any other differences?

11       A.  I don't know what you mean.  How --

12       Q.  I'm asking you.

13                   MR. HAFFNER:  Again, objection, calls

14   for a legal conclusion.

15             You can answer.

16       A.  Anything -- any time I'm out of my truck is

17   off duty.

18       Q.  (By Mr. Smedstad)  Unless you're working,

19   correct?

20                   MR. HAFFNER:  Objection, calls for a

21   legal conclusion.

22       Q.  (By Mr. Smedstad)  Right?

23       A.  If I'm working, then I'm on duty, not off

24   duty.

25       Q.  Got it.  You told me that you quit Western

Page 81

1                    REPORTER'S CERTIFICATE

2          I, MINDI L. PETTIT, the undersigned Certified

3    Court Reporter pursuant to RCW 5.28.010 authorized to

4    administer oaths and affirmations in and for the State

5    of Washington, do hereby certify that the sworn

6    testimony and/or proceedings, a transcript of which is

7    attached, was given remotely before me at the time and

8    place stated therein; that any and/or all witness(es)

9    were duly sworn to testify to the truth; that the sworn

10   testimony and/or proceedings were by me

11   stenographically recorded and transcribed under my

12   supervision, to the best of my ability; that the

13   foregoing transcript contains a full, true, and

14   accurate record of all the sworn testimony and/or

15   proceedings given and occurring at the time and place

16   stated in the transcript; that a review of which was

17   requested; that I am in no way related to any party to

18   the matter, nor to any counsel, nor do I have any

19   financial interest in the event of the cause.

20         WITNESS MY HAND AND DIGITAL SIGNATURE this 29th

21   da _____

22

23   _____

     MINDI L. PETTIT, RPR

24   Washington State Certified Court Reporter #2519

     Idaho State Certified Shorthand Reporter #1141

25   mindi.pettit.courtreporter@charter.net

```
                                                              Page 82
 1                          Veritext Legal Solutions
                                1100 Superior Ave
 2                                 Suite 1820
                             Cleveland, Ohio 44114
 3                            Phone: 216-523-1313
 4
        June 30, 2021
 5
        To: MR. HAFFNER
 6
        Case Name: Sanders, Richard v. Western Express, Inc.
 7
        Veritext Reference Number: 4631355
 8
        Witness:  Richard Sanders      Deposition Date:  6/15/2021
 9
10      Dear Sir/Madam:
11
        Enclosed please find a deposition transcript.  Please have the witness
12
        review the transcript and note any changes or corrections on the
13
        included errata sheet, indicating the page, line number, change, and
14
        the reason for the change.  Have the witness' signature notarized and
15
        forward the completed page(s) back to us at the Production address
16      shown
17      above, or email to production-midwest@veritext.com.
18
        If the errata is not returned within thirty days of your receipt of
19
        this letter, the reading and signing will be deemed waived.
20
21      Sincerely,
22      Production Department
23
24
25      NO NOTARY REQUIRED IN CA
```

Exhibit 3

Page  42 of 61

```
                                                    Page 83
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
           ASSIGNMENT REFERENCE NO: 4631355
 3         CASE NAME: Sanders, Richard v. Western Express, Inc.
           DATE OF DEPOSITION: 6/15/2021
 4         WITNESS' NAME: Richard Sanders
 5         In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7         I have made no changes to the testimony
      as transcribed by the court reporter.
 8

      _____          _____
 9    Date                      Richard Sanders
10         Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11    the referenced witness did personally appear
      and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
                Statement; and
14         Their execution of this Statement is of
                their free act and deed.
15
           I have affixed my name and official seal
16
      this _____ day of_____, 20____.
17
                     _____
18                   Notary Public
19                   _____
                     Commission Expiration Date
20
21
22
23
24
25
```

Exhibit 3
Page  43 of 61

```
                                              Page 84

  1               DEPOSITION REVIEW
                CERTIFICATION OF WITNESS

  2
            ASSIGNMENT REFERENCE NO: 4631355
  3         CASE NAME: Sanders, Richard v. Western Express, Inc.
            DATE OF DEPOSITION: 6/15/2021
  4         WITNESS' NAME: Richard Sanders
  5         In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
  6    my testimony or it has been read to me.
  7         I have listed my changes on the attached
       Errata Sheet, listing page and line numbers as
  8    well as the reason(s) for the change(s).
  9         I request that these changes be entered
       as part of the record of my testimony.
 10
            I have executed the Errata Sheet, as well
 11    as this Certificate, and request and authorize
       that both be appended to the transcript of my
 12    testimony and be incorporated therein.
 13    _____         _____
       Date                     Richard Sanders
 14
            Sworn to and subscribed before me, a
 15    Notary Public in and for the State and County,
       the referenced witness did personally appear
 16    and acknowledge that:
 17         They have read the transcript;
            They have listed all of their corrections
 18             in the appended Errata Sheet;
            They signed the foregoing Sworn
 19             Statement; and
            Their execution of this Statement is of
 20             their free act and deed.
 21         I have affixed my name and official seal
 22    this _____ day of_____, 20____.
 23             _____
                Notary Public
 24
                _____
 25             Commission Expiration Date
```

Veritext Legal Solutions

Exhibit 3
Page  44 of 61

Page 85

1                          ERRATA SHEET
                 VERITEXT LEGAL SOLUTIONS MIDWEST
2                     ASSIGNMENT NO: 4631355
3       PAGE/LINE(S) /       CHANGE        /REASON
4       _____
5       _____
6       _____
7       _____
8       _____
9       _____
10      _____
11      _____
12      _____
13      _____
14      _____
15      _____
16      _____
17      _____
18      _____
19

        _____        _____
20      Date                      Richard Sanders
21      SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22      DAY OF _____, 20_____ .
23                       _____
                         Notary Public
24
                         _____
25                       Commission Expiration Date

1  Joshua H. Haffner, WSBA #53292
2  Graham G. Lambert, WSBA #55761
   445 South Figueroa Street, Suite 2625
3  Los Angeles, California 90071
   Telephone: (213) 514-5681
4  Facsimile: (213) 514-5682
5  Email:  jhh@haffnerlawyers.com
            gl@haffnerlawyers.com
6
7  Attorneys for Plaintiff, RICHARD
   SANDERS, an individual, on behalf
8  of himself and all others similarly
   situated
9

10

11

12

13           **UNITED STATES DISTRICT COURT**

14         **EASTERN DISTRICT OF WASHINGTON**

15  RICHARD SANDERS, an            **Case No.  1:20-cv-03137-SAB**
    individual, on behalf of himself and
16  all others similarly situated,

17                                  **FIRST AMENDED CLASS ACTION
                          Plaintiff,  COMPLAINT**
18
                                    **(JURY TRIAL DEMANDED)**
19            v.

20  WESTERN EXPRESS, INC.; and
21  DOES 1 through 10, inclusive,

22            Defendant.

23

24       Plaintiff Richard Sanders ("Plaintiff") is informed and believes, and on that

25  basis alleges, as follows:

26            **NATURE OF THE ACTION**

27       1.    This is a Washington class and Federal Labor Standards Act

28  ("FLSA") collective action for failure to pay for rest breaks, minimum

**Exhibit
0002**

               FIRST AMENDED CLASS ACTION COMPLAINT

Exhibit 3
Page  46 of 61

1   other labor violations.  As more fully described herein, Defendant Western
2   Express, Inc. ("Defendant") paid Plaintiff and class members on a per mile driven
3   basis.  Defendant's pay plan failed to compensate Plaintiff and other drivers for
4   rest breaks or minimum wage for non driving activities.  Plaintiff seek among other
5   things, all wages, and statutory remedies.

6                                   **PARTIES**

7        2.      Plaintiff Richard Sanders was, at all relevant times, a resident and
8   citizen of Washington.  Plaintiff Sanders was employed by Defendant from
9   approximately December 2019 through August 2020 as a driver.

10       3.      Defendant Western Express, Inc. is a transportation company, that is
11  authorized to conduct and is actually conducting business in the State of
12  Washington, and that designates its main office in Tennessee.

13       4.      Plaintiff is currently ignorant of the true names and capacities,
14  whether individual, corporate, associate, or otherwise, of the Defendants sued
15  herein under the fictitious names Does 1 through 10, inclusive, and therefore sue
16  such Defendants by such fictitious names.  Plaintiff will seek leave to amend this
17  complaint to allege the true names and capacities of said fictitiously named
18  Defendants when their true names and capacities have been ascertained.  Plaintiff
19  is informed and believes and thereon alleges that each of the fictitiously named
20  Defendants is legally responsible in some manner for the events and occurrences
21  alleged herein, and for the damages suffered by the Class.

22       5.      Plaintiff is informed and believe and thereon allege that all
23  Defendants, including the fictitious Doe Defendants, were at all relevant times
24  acting as actual agents, conspirators, ostensible agents, alter egos, partners and/or
25  joint venturers and/or employees of all other Defendants, and that all acts alleged
26  herein occurred within the course and scope of said agency, employment,
27  partnership, and joint venture, conspiracy or enterprise, and with the express and/or
28  implied permission, knowledge, consent authorization and ratification of their co-

<div align="center">2

**FIRST AMENDED CLASS ACTION COMPLAINT**</div>

Exhibit 3
Page  47 of 61

1  Defendant; however, each of these allegations are deemed "alternative" theories

2  whenever not doing so would result in a contradiction with other allegations.

3  ## JURISDICTION AND VENUE

4  6.      This Court has jurisdiction over the entire action by virtue of the fact

5  that this is a civil action wherein the matter in controversy, exclusive of interest

6  and costs, exceeds the jurisdictional minimum of the Court.  The acts and

7  omissions complained of in this action took place in part in the State of

8  Washington. At least one Defendant is a citizen of a state outside of Washington,

9  and federal diversity jurisdiction exists and/or jurisdiction under the Class Action

10 Fairness Act ("CAFA").  The class amount at issue exceeds $5,000,000 and the

11 jurisdictional minimum of this Court under CAFA.  Venue is proper because this is

12 a class action, the acts and/or omissions complained of took place, in whole or in

13 part within the venue of this Court.

14 ## FACTUAL ALLEGATIONS

15 7.      Plaintiff and the Class worked as drivers for Defendant transporting

16 goods in trucks.  Defendant paid Plaintiffs and Class members on a per mile basis.

17 8.      Plaintiffs and class members were not paid for rest breaks because

18 Defendant's "piece rate," or per mile, pay plan failed to compensate for rest

19 breaks, and failed to treat rest breaks as "on the employer's time," in violation of

20 Washington Administrative Code §296-126-092(4).

21 9.      Because Plaintiffs and Class members are primarily paid on a per mile

22 basis, they are for the large part only paid for driving time, and are not

23 compensated for non-driving time work performed by Plaintiffs and Class

24 members.  The non-driving time Plaintiffs and Class members worked for

25 Defendant and were not compensated for includes, but is not limited to, pre and

26 post trip inspections, meetings, waiting for loading or unloading of goods

27 transported, training, driving back with empty loads (also known as dead heading),

28 and while on the road, away from home, for over 24 hours.  Defendant's failure to

<div align="center">

3

**FIRST AMENDED CLASS ACTION COMPLAINT**

</div>

Exhibit 3

Page  48 of 61

1  compensate Plaintiffs and Class members for all time worked violates Revised

2  Code of Washington §49.46.020.

3      10.    For example, the final week that Plaintiff worked for Defendant, he

4  drove from Tulare, California to Lacey, Washington.  Despite travelling over 916

5  miles, a portion of which necessarily occurred within the state of Washington,

6  Plaintiff received no compensation at all for this work.

7      11.    Defendant's conduct, as alleged herein, has caused Plaintiff and Class

8  members damages including, but not limited to, loss of wages and compensation.

9  Plaintiffs and Class members experienced these violations each qualifying shift

10 they worked because of the nature of Defendant's pay plan.

11     12.    Plaintiffs are informed and believes, and on that basis alleges, that

12 Plaintiff and the Class did not knowingly submit to the wage violations alleged

13 herein.  Revised Code of Washington §49.52.070 provides that employers who

14 violate Washington's minimum wage laws under the circumstances present in this

15 case are liable for double the amount of wages improperly withheld.  Pursuant to

16 Revised Code of Washington §49.52.080, there exists a presumption of

17 willfulness.

18     13.    Defendant failed to pay Plaintiff and other class members minimum

19 wage in compliance with the Federal Labor Standards Act ("FLSA").  Pursuant to

20 29 C.F.R §785.22(a), Plaintiff and similarly situated drivers must paid for all non-

21 driving time when on the road for over 24 hours.  Plaintiff and collective and class

22 members regularly drove for Defendant and were on the road for over 24 hours,

23 without being compensated federal minimum wage, in violation of 29 C.F.R

24 §785.22(a).  Plaintiff is informed and believes, and on that basis alleges, that

25 Defendant fails to pay its drivers for all on duty time, or for rest breaks less than 20

26 minutes, in violation of 29 C.F.R. §785.18.  Plaintiff is informed and believes, and

27 on that basis alleges, Defendant fails to pay its drivers for all compensable

28 orientation and training time.

<div align="center">

4

**FIRST AMENDED CLASS ACTION COMPLAINT**

</div>

Exhibit 3

Page  49 of 61

14.    Plaintiff and all similarly situated drivers are victims of a single, similarly applied employer-based compensation policy. In violation of Washington law and the FLSA, that policy has been applied, and continues to be applied, to all Defendant's drivers.

15.    Plaintiff is a member of and seeks to be the representative for the Class of similarly situated employees who all have been exposed to, have suffered, and/or were permitted to work under, Defendant's unlawful employment practices as alleged herein.

## CLASS DEFINITIONS AND CLASS ALLEGATIONS

16.    Plaintiff brings this action on behalf of herself, and on behalf of all others similarly situated, and as a member of the Class defined as follows:

> **Washington Class**:  All current or former Washington residents who worked for Defendant as drivers at any time beginning three (3) years prior to the filing of the Complaint through the date notice is mailed to the Class.

> **FLSA Class**:  All current or former Washington residents who worked for Defendant as drivers at any time beginning three (3) years prior to the filing of the Complaint through the date notice is mailed to the Class.

17.    Plaintiff reserves the right to amend or otherwise alter the sub-class definitions presented to the Court at the appropriate time, or to propose or eliminate sub-classes, in response to facts learned through discovery, legal arguments advanced by Defendant or otherwise.

18.    This action has been brought and may be properly maintained as a class action pursuant to Federal Rules of Civil Procedure Rule 23 and other applicable law, as follows:

19.    **Numerosity of the Class:**  Members of the Class are so numerous that their individual joinder is impracticable.  The precise number of Class

Exhibit 3

Page  50 of 61

1  members and their addresses are known to Plaintiff or will be known to Plaintiff
2  through discovery.  Class members may be notified of the pendency of this action
3  by mail, electronic mail, the Internet, or published notice.

4      20.     **Existence of Predominance of Common Questions of Fact and**
5  **Law:**  Common questions of law and fact exist as to all members of the Class.
6  These questions predominate over any questions affecting only individual Class
7  members. These common legal and factual questions include:

8      a.  Whether Defendant's pay plan fails to compensate for rest break time;
9      b.  Whether Defendant's failure to pay for rest break time was willful;
10     c.  Whether Plaintiffs and each member of the Class were not paid
11         minimum wage for time worked during the Class period;
12     d.  Whether Plaintiffs and each member of the Class were not paid overtime
13         for time worked during the Class period;
14     e.  Whether Defendant's failed to compensate for orientation and training
15         time;
16     f.  The nature and extent of class-wide injury and the measure of damages
17         for the injury.

18     21.     **Typicality**: Plaintiff's claims are typical of the claims of the members
19  of the subclasses they represent because Plaintiff, as a driver for Defendant, was
20  exposed and subjected to the same unlawful business practices as other drivers
21  employed by Defendant during the liability period.  Plaintiff and the members of
22  the class she represents sustained the same types of damages and losses.

23     22.     **Adequacy:** Plaintiff is adequate representatives of the Class they
24  seeks to represent because their interests do not conflict with the interests of the
25  members of the subclasses Plaintiff seeks to represent.  Plaintiff has retained
26  counsel competent and experienced in complex class action litigation and Plaintiff
27  intend to prosecute this action vigorously.  The interests of members of each Class
28  will be fairly and adequately protected by Plaintiff and their counsel.

Exhibit 3
Page  51 of 61

23.   **Superiority and Substantial Benefit:** The class action is superior to other available means for the fair and efficient adjudication of Plaintiff and the Class members' claims. The violations of law were committed by Defendant in a uniform manner and class members were exposed to the same unlawful practices. The damages suffered by each individual Class member may be limited.  Damages of such magnitude are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct.  Further, it would be virtually impossible for the Class members to redress the wrongs done to them on an individual basis. Even if members of the Class themselves could afford such individual litigation, the court system could not. Individualized litigation increases the delay and expense to all parties and the court system, due to the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

24.   The Class should also be certified because:

a. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendant;

b. The prosecution of separate actions by individual members of the Class would create a risk of adjudication with respect to them, which would, as a practical matter, be dispositive of the interests of the other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c. Defendant has acted or refused to act on grounds generally applicable to the Class, and/or the general public, thereby making appropriate final and injunctive relief with respect to the Classes as a whole.

7
**FIRST AMENDED CLASS ACTION COMPLAINT**

Exhibit 3
Page  52 of 61

**FIRST CAUSE OF ACTION**
**FAILURE TO PAY REST BREAKS**
**(Against All Defendants)**

25.     Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

26.     Revised Code of Washington §49.12.010 provides that "[t]he welfare of the state of Washington demands that all employees be protected from conditions of labor which have a pernicious effect on their health.  The state of Washington, therefore, exercising its police and sovereign power declares that inadequate wages and unsanitary conditions of labor exert such pernicious effect."

27.     Revised Code of Washington §49.12.020 provides that "[i]t shall be unlawful to employ any person in any industry or occupation within the State of Washington under conditions of labor detrimental to their health."  Under Revised Code of Washington §49.12.005 and Washington Administrative Code §296-126-002, conditions of labor "means and includes the conditions of rest . . . periods" for employees.

28.     Washington Administrative Code §296-126-092(4) provides as follows:  "Employees shall be allowed a rest period of not less than ten minutes, on the employer's time, for each four hours of working time."

29.     At all times relevant during the liability period, Defendant willfully failed and refused, and continues to willfully fail and refuse, to pay Plaintiff and Washington Class members the amounts owed.  Specifically, Defendant pays drivers on a per mile basis, and thus does not provide paid rest break time.  This conduct violates Washington law as alleged in this cause of action.

30.     Defendant's unlawful conduct alleged herein occurred in the course of employment of Plaintiff and all other similarly situated class members, and Defendant has done so continuously throughout the filing of this complaint.

31.     As a direct and proximate result of Defendant's violation Washington

Exhibit 3
Page  53 of 61

rest break law, Plaintiff and other Washington Class members have suffered harm and money damages. Plaintiff, on behalf of himself and on behalf of the Washington Class, seeks damages for unpaid rest breaks, at their regular rate of pay, and all other relief allowable, including all unpaid wages, double damages, and attorney's fees.

### SECOND CAUSE OF ACTION
### FAILURE TO PAY MINIMUM WAGE
### (Against All Defendants)

32.     Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

33.     Revised Code of Washington §§49.46.020 and 49.46.120 establish Washington State's minimum wage standards.

34.     Revised Code of Washington §49.46.090 provides: "Any employer who pays any employee less than wages to which such employee is entitled under or by virtue of this chapter, shall be liable to such employee affected for the full amount of such wage rate, less any amount actually paid to such employee by the employer, and for costs and such reasonable attorney's fees as may be allowed by the court."

35.     As set forth herein, Defendant failed to compensate Plaintiff and Class members for non-driving time, and thus violated Washington's minimum wage laws.

36.     Defendant's actions alleged herein have violated Washington minimum wage laws, and Defendant is therefore liable to Plaintiff and the Washington Class for actual damages, double damages, and attorneys' fees and costs, in amounts to be determined at trial.

### THIRD CAUSE OF ACTION
### WILLFUL REFUSAL TO PAY WAGES
### (Against All Defendants)

37.     Plaintiff re-alleges and incorporates all preceding paragraphs as if

Exhibit 3
Page 54 of 61

fully set forth herein.

38.     Defendant's have denied Plaintiff and the Washington Class wages and benefits of employment, as alleged herein, in violation of Revised Code of Washington §49.52.050.  Defendant is, therefore, liable to Plaintiff for all such pay and other improperly deducted, rebated wages or unpaid earnings, and double damages, under Revised Code of Washington §49.52.070.

39.     Plaintiff and the Washington Class have been deprived of  wages and/or compensation, and Defendant is are liable for actual damages, double damages, and attorneys' fees and costs, in amounts to be determined at trial.

### FOURTH CAUSE OF ACTION
### FAILURE TO PAY OVERTIME
**(Against All Defendants)**

40.     Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

41.     Plaintiff and class members worked for Defendants over 40 hours a week while in Washington, and were entitled to overtime under Washington law. Defendant, however, failed to pay any such overtime.

42.     Revised Code of Washington §49.46.130 provides that no employer shall employ any employee for a workweek longer than 40 hours unless the employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and half times the regular rate at which he is employed.

43.     By its action alleged herein, including but not limited to, not paying for overtime, Defendants violated Washington overtime law.  In addition, when Defendant did pay overtime, Defendants failed to properly calculate the regulate rate of pay for overtime purposes by failing to include non-discretionary bonuses when calculating the regular rate.

44.     As a result, Plaintiff and the Class have been deprived of wages and/or compensation, and Defendant is liable for actual damages, double

<div align="center">10</div>

<div align="center">**FIRST AMENDED CLASS ACTION COMPLAINT**</div>

Exhibit 3

Page  55 of 61

damages, and attorneys' fees and costs, in amounts to be determined at trial.

## FIFTH CAUSE OF ACTION
### Failure To Pay All Wages At Termination
### (Against All Defendants)

45.     Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

46.     Revised Code of Washington §49.48.010 provides that "[w]hen any employee shall cease to work for an employer, whether by discharge or by voluntary withdrawal, the wages due to him on account of his employment shall be paid to him at the end of the established pay period."

47.     By the actions alleged above, Defendant violated Revised Code of Washington §49.48.010 by failing to provide all wages upon termination of employment.

48.     As a result of Defendant's unlawful acts, Plaintiffs and the Class have been deprived of compensation in an amount to be determined at trial.  Pursuant to Revised Code of Washington §§49.46.090 and 49.48.030, Plaintiffs and the Class are entitled to recover attorneys' fees and costs of the suit.

## SIXTH CAUSE OF ACTION
### Violation of Washington's Consumer Protection Act
### (Against All Defendants)

49.     Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

50.     Defendant engaged in unfair or deceptive acts and practices when it: (i) failed to pay Plaintiffs and the Class wages for all work done; (ii) failed to provide Plaintiffs and the Class with compliant rest breaks; (iii) failed to properly pay for all overtime worked; (iv) willfully refused to pay all wages; and (v) failed to pay all wages due at termination.

51.     Defendant's unfair or deceptive acts and practices repeatedly occurred in Defendant's business, injured Plaintiff and the class and impacted the public

Exhibit 3
Page  56 of 61

1    interest because they also injured other persons and had and have the capacity to
2    injure others.

3         52.    As a direct and proximate cause of Defendant's unfair or deceptive
4    acts and practices, Plaintiff and the Class have suffered actual damages in that they
5    were wrongfully denied payment of all wages owed, were prevented from
6    receiving compliant rest breaks, were not properly paid all overtime to which they
7    were entitled, were willfully denied wages, and were not paid all wages due at
8    separation.

9         53.    As a result of Defendants' unfair and deceptive practices, Plaintiffs
10   and the Class are entitled, pursuant to Revised Code of Washington §19.86.090, to
11   recover treble damages, reasonable attorneys' fees, and costs.

12                        **SEVENTH CAUSE OF ACTION**
13                        **FEDERAL LABOR STANDARDS ACT**
                              **(Against All Defendants)**

14        54.    Plaintiff re-alleges and incorporates all preceding paragraphs as if
15   fully set forth herein.

16        55.    At all relevant times herein, Plaintiff and the FLSA Class has been
17   entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C.
18   §§ 201, *et seq.*

19        56.    The FLSA regulates, among other things, the payment of minimum
20   wage by employers whose employees are engaged in interstate commerce, or
21   engaged in the production of goods for commerce, or employed in an enterprise
22   engaged in commerce or in the production of goods for commerce. 29 U.S.C. §
23   206(a); 29 U.S.C. § 207(a)(1).

24        57.    Defendant is subject to the FLSA's minimum wage requirements
25   because it is in interstate commerce and its employees are engaged in commerce.

26        58.    Defendant pay plan applicable to all members of the FLSA class pays
27   drivers on a per-mile basis, and does not pay for non-driving time.  Defendant's
28   compensation fails to pay minimum wage to its drivers under federal law, when

                                      12
                **FIRST AMENDED CLASS ACTION COMPLAINT**

Exhibit 3
Page  57 of 61

accounting for business expenses not reimbursed.  In addition, pursuant to 29 C.F.R §785.22(a), while on the road for over 24 hours, Plaintiff and FLSA Class members were on duty for 24 or, at a minimum, but were not compensated at the federal minimum wage for all hours worked.  Defendant knew or should have known that its compensation policy and methodology failed to compensate the drivers at the federal minimum wage.

59. Defendant, pursuant to its policy and practice, violated the FLSA by refusing and failing to pay federal minimum wage to Plaintiff and other similarly situated employees.

60. Section 13 of the FLSA, codified at 29 U.S.C. § 213, exempts certain categories of employees from federal minimum wage obligations. None of the FLSA exemptions apply to Plaintiff or other similarly situated drivers.

61. Plaintiff and all similarly situated employees are entitled to damages equal to the minimum wage minus *actual* wages received, within three years from the date each Plaintiff joins this case, plus periods of equitable tolling, because Defendant acted willfully and knew, or showed reckless disregard for, whether their conduct was unlawful.

62. Defendants have acted neither in good faith nor with reasonable grounds to believe that their actions and omissions were not a violation of the FLSA, and as a result, Plaintiff and other similarly situated employees are entitled to recover an award of liquidated damages under 29 U.S.C. § 216(b) in an amount equal to the amount of their unpaid minimum wages. Alternatively, should the Court find Defendants did not act willfully in failing to pay minimum wage, Plaintiff and all similarly situated employees are entitled to an award of prejudgment interest at the applicable legal rate.

63. As a result of the aforesaid willful violations of the FLSA's minimum wage provisions, minimum wage compensation has been lawfully withheld by Defendant from Plaintiff and all similarly situated employees. Accordingly,

Exhibit 3
Page  58 of 61

Defendant is liable under 29 U.S.C. § 216(b), together with an additional amount as liquidated damages, prejudgment and post-judgment interest, reasonable attorneys' fees, and costs of this action.

## **PRAYER**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated and also on behalf of the general public, pray for judgment against Defendant as follows:

A. An order that this action may proceed and be maintained as a class action;

B. A declaration Defendant is financially responsible for notifying all Class members of its wage and hour violations;

C. Appoint Plaintiff as class representative;

D. Appoint the undersigned as class counsel;

E. Declare the actions complained of violate Washington law;

F. Award Plaintiffs and the class compensatory damages, including lost wages;

G. Award Plaintiffs and the class damages and/or compensation for unpaid rest breaks;

H. Award Plaintiffs and the class all minimum wages owed;

I. Award double damages pursuant to Revised Code of Washington §49.50.050.

J. For all applicable statutory penalties under Washington law;

K. An order allowing other similarly situated drivers to receive notice and opportunity to opt-in to this case pursuant to 29 U.S.C. § 216(b) of the FLSA;

L. An award of damages in the amount of unpaid minimum wages at the federal minimum wage rate to the FLSA Class;

M. Liquidated damages for the FLSA Class;

14
**FIRST AMENDED CLASS ACTION COMPLAINT**

Exhibit 3
Page 59 of 61

N. An order enjoining Defendants from further unfair and unlawful
business practices and requiring them to comply with the FLSA;

O. Prejudgment interest at the maximum legal rate;

P. Reasonable attorneys' fees;

Q. Accounting of Defendant's records for the liability period;

R. General, special and consequential damages, to the extent allowed by
law;

S. Costs of suit; and

T. Such other relief as the Court may deem just and proper.

DATED:  November 11, 2020                **HAFFNER LAW PC**

By:    /s/ Joshua H. Haffner
Joshua H. Haffner, WSBA #53292
Graham G. Lambert, WSBA #55761
445 South Figueroa Street, Suite 2625
Los Angeles, California 90071
Telephone: (213) 514-5681
Facsimile: (213) 514-5682
Email:  jhh@haffnerlawyers.com

Exhibit 3
Page  60 of 61

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for himself and the Class and FLSA Collective Class members on all claims so triable.

DATED:  November 11, 2020          **HAFFNER LAW PC**


            By:     /s/ Joshua H. Haffner
                          Joshua H. Haffner, WSBA #53292
                          Graham G. Lambert, WSBA #55761
                          445 South Figueroa Street, Suite 2625
                          Los Angeles, California 90071
                          Telephone: (213) 514-5681
                          Facsimile: (213) 514-5682
                          Email:  jhh@haffnerlawyers.com

16

**FIRST AMENDED CLASS ACTION COMPLAINT**

Exhibit 3
Page  61 of 61